UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION


IN RE:

SUSAN MARIE FLISS                                    Chapter 7

    Debtor.                                Bankruptcy No. 05-02455S

SUSAN MARIE FLISS

    Plaintiff

vs.                                              Adversary No. 05-9087S

IOWA DEPARTMENT OF REVENUE

    Defendant.


<u>DECISION</u>

Debtor Susan Marie Fliss asks the court to determine that her income tax liabilities to the State of Iowa for the years 1999, 2000, and 2001 are discharged.  The Iowa Department of Revenue (IDR) asks that the unpaid taxes for these years be excepted from Fliss's discharge because her tax returns were fraudulent and because she willfully attempted to evade or defeat the taxes.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

Trial was held February 15, 2006 in Sioux City.  Donald H. Molstad appeared as attorney for Fliss.  John Waters appeared as attorney for IDR.


<u>Findings of Fact</u>

Susan Marie Fliss is 45 years old.  She and her husband Gene live in Everly, Iowa.  They have been married for 25 years and have

three children, one of whom still lives at home.  Fliss graduated
from high school in Everly.  She attended Kearney State College in
Nebraska for one year.  During her year at Kearney State, she took
general education classes with an emphasis in accounting.

After graduating from high school, Fliss worked for a
veterinarian and also at a convenience store as a stocker and
cashier.  Her first job at a bank was with Northwest Federal Savings
Bank in Spencer, Iowa.  She was a teller there for five years,
before accepting a position in November 1997 as a teller at State
Bank in Everly (hereinafter Bank or State Bank).

Karla Saboe, Fliss's supervisor at State Bank, considered her a
very capable, intelligent, knowledgeable and trusted employee.
Fliss was employed by the State Bank for a short time, than four
years.  During that time, her duties included acting as a teller and
working with credit card transactions and individual retirement
accounts.  One of her regular duties was to count and record the
money in the vault, including "mutilated" money.  Mutilated money
was cash of a damaged or worn condition which Bank had determined to
remove from circulation among customers.  This cash was segregated
from circulated cash in the Bank's vault in Everly.  It was
periodically counted and stored in bags with inventory information
attached.  At some point, mutilated money would be shipped to the
Federal Reserve Bank in Chicago.

Fliss testified that in 1999 she began embezzling cash from the
Bank.  The embezzlements continued until March 2002.  She did not

keep a record of how much she took.  She says she spent the money on family living expenses, which had gotten "out of hand."

State Bank did not discover the embezzlement.  Fliss accomplished the inventory of cash in the vault either alone or with the help of another Bank employee.  She said she "confirmed" the money count as agreeing with the balance logs attached to the bags of mutilated bills.  She inflated the count of mutilated money to cover up the embezzlement.

Fliss testified that she intended to pay the money back, but the embezzlement reached an amount that she could not repay.  She said she felt guilty and wanted to set matters right.  On March 5, 2002, Fliss contacted attorney Randy Sease at his office; she disclosed her embezzlement to him.

On March 5 also, Sease contacted Wayne Johnson, president of Bank.  Sease asked if he could come to Johnson's office to discuss a matter of importance.  They met a short while later, and Sease disclosed Fliss's confession and embezzlement to Johnson.  Based on an estimate from Fliss, Sease told Johnson that the amount of the embezzlement was approximately $143,000 or $144,000.

Johnson and Karla Saboe, Bank's cashier, met later in the day with State Bank's attorney.  From the attorney's office, Johnson called Fliss.  He had been advised by the attorney to inquire whether money had been taken from the accounts of particular customers.  Fliss disclosed that she had embezzled from cash in Bank's vault.

State Bank completed its own internal audit.  It revealed that the embezzlement was approximately $144,000.00.

Sometime after March 5, 2002, when Fliss met with Sease, and before April 5, 2002, Fliss met with attorney Donald H. Molstad regarding her situation.  Molstad advised Fliss that she needed to file amended tax returns to show the embezzled money as income.  Fliss hired A.J. Reynolds, a tax preparer, to complete the amended returns.

Fliss and her husband Gene had filed their 1999 joint Iowa tax return in March 2000.  Fliss's income from wages for 1999 was reported as $16,088.00 (Exhibit D).  Her income figure did not include any money from her embezzlements.  Fliss filed an amended Iowa return for 1999 on April 15, 2002.  She increased her reported "gross income" to $26,302.00 to account for "inadvertently omitted other non self employment income in the amount of $10,214.00 on original return." (Exhibit E, p. 2.)  This figure represented her estimate of her embezzlements in 1999.

Fliss and her husband had filed their 2000 joint Iowa tax return in March 2001.  Fliss's income from wages in 2000 was reported as $16,419.00 (Exhibit F).  Her reported income did not include any money from her embezzlements from State Bank.  Fliss filed an amended Iowa return for 2000 on May 15, 2002.  On the amended return she increased her "gross income" for the year to $77,703.00 to account for "inadvertently omitted other non self employment income in the amount of $61,284.00 on original return."

4

(Exhibit G, p. 2.)  This figure represented her estimate of her embezzlements from Bank in 2000.

Fliss and her husband had filed their 2001 joint Iowa tax return in March 2002.  She reported her wages as $16,629.00 for 2001.  This figure did not include any money from embezzlement (Exhibit H).  In May 2002 she filed her amended Iowa tax return for 2001 (Exhibit I).  She increased her reported "gross income" to $77,913.00 (id. at p. 1), an increase of $61,284.00.  This represented her estimate of her embezzlements from Bank during 2001.

Bank President Johnson believes that Fliss also embezzled money during 2002.  Fliss's income tax liability for tax year 2002 is not at issue in this proceeding.

For purposes of preparing the original returns, Fliss did not disclose to her tax preparer in any of the three years that she had embezzlement income.  She testified she was unaware that she had to report it as income.  Based on her amended tax returns, all filed in 2002, she estimated her embezzlements from 1999 through 2001 as totaling $132,782.00.  The IDR assessed taxes against Fliss.

Gene Fliss did not join in the amended returns.  He testified that he was unaware of the embezzlements.  To avoid liability for the increased tax obligation, Gene Fliss applied for "innocent spouse" status in May 2002.  IDR granted the status about six months later.

State Bank filed a criminal complaint against Susan Fliss on April 8, 2002, alleging theft in the first degree, a class "C"

felony (Exhibit A).  The Clay County attorney filed a criminal information against Fliss on May 2, 2002 (Exhibit B).  Fliss hired attorney Dan Connell of Storm Lake to represent her in the criminal proceedings.  It was expected that Fliss would have to make restitution to avoid incarceration.

Gene Fliss told his wife he would help her.  He had inherited an undivided interest with siblings in a quarter section of farm ground.  He told Susan he would consider selling the property to raise money.  Mr. Fliss said that he was willing to lose the property, but he did not want to lose all his property.  He told Susan he wanted to keep their home and their vehicles.  The couple therefore completed various financial transactions.  On April 5, 2002, Fliss and her husband executed a quit claim deed on their jointly owned homestead to Gene only (Exhibit J).  Susan Fliss said that at the time of the transfer, the home was worth about $50,000.00.  State Bank had a mortgage against it.  Gene Fliss refinanced the house with another lender, receiving $27,940.14. This amount was deposited in attorney Connell's trust account on December 31, 2002.  Of this amount, $18,984.04 was used to pay off State Bank's mortgage against the home, and the remaining $8,956.10 was paid to State Bank as restitution.

The couple jointly owned four motor vehicles.  These included a 1989 Chevy Cavalier, a 1995 Dodge Neon, a 1999 Dodge Neon, and a 2001 Ford Crewcab F-250 pickup truck.  During June 2002, the couple transferred all but the 1999 Dodge Neon into Gene's name alone

(Exhibits K, L, and M).  Gene Fliss testified that at the time of the transfer, the Chevy Cavalier was worth about $200.00, but it was junked a short time after the transfer.  He said the 1995 Dodge Neon was worth $2,000.00 to $3,000.00 at the time, and there was no debt against it.  He believes that the Crewcab was worth about $20,000.00, but it was encumbered by a lien of about $16,000.00 held by State Bank.  Mr. Fliss borrowed money from his sister to pay off Bank's lien against the Crewcab; he gave his sister a lien to secure the loan.

Gene Fliss sold his interest in his inherited farm ground to siblings, receiving $66,000.00.  Of that amount, $60,000.00 was transferred to Dan Connell's trust account on March 7, 2003 to help his wife make restitution to State Bank.  The $6,000.00 remaining from the sales proceeds was used to pay off State Bank's lien against the 1999 Dodge Neon.  Gene Fliss testified that the 1999 Dodge Neon was worth $4,000.00 to $6,000.00.  Susan and Gene Fliss transferred this vehicle into Gene's name alone in June 2003 (Exhibit N).

Gene Fliss testified that the transfers were made because he did not want to lose his home or the vehicles to the Bank.

On April 15, 2003, Susan Fliss pleaded guilty to class "C" felony theft.  As part of a plea bargain, the State concurred in a 10-year suspended sentence.  Fliss was placed on probation for five years and sentenced to 250 hours of community service (Exhibit C).  As a non-habitual offender, Fliss had faced a maximum 10 years'

incarceration (<u>id.</u> p. 2).

Fliss, with the help of her husband and the use of some of her own retirement resources, paid State Bank $25,000.00 in restitution to cover its insurance deductible, and paid $60,000.00 in restitution to Kansas Bankers Surety Company.  Gene Fliss testified that the total paid in restitution was closer to $87,800.00.

Susan Fliss reached an agreement with IDR to pay the additional tax assessment, based on her embezzlement income, over time at the rate of $75.00 per month.  She believes she paid that amount for about one year.  She filed her chapter 7 bankruptcy petition on May 25, 2005.  The court takes judicial notice that she listed the IDR as a creditor holding an unsecured, priority claim of $9,547.64 for income taxes for the years 1999, 2000, and 2001 (No. 05-02455, Doc. 1, Schedule E).  As of February 1, 2006, her remaining indebtedness to IDR for the 1999-2001 income taxes was $9,743.98 (Exhibit O).  IDR concedes that a tax penalty assessed for 2000 is dischargeable.  Therefore, the amount at issue is approximately $9,500.00.  (Brief, Doc. 24, p. 2.)


<u>Discussion</u>

A Chapter 7 discharge does not discharge debt for a tax "with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax."  11 U.S.C. § 523(a)(1)(C).  The taxing authority bears the burden of proving by a preponderance of the evidence that the taxes are nondischargeable.

<u>United States v. Fegeley (In re Fegeley)</u>, 118 F.3d 979, 983 (3d Cir.

1997); <u>May v. Missouri Dept. of Revenue (In re May)</u>, 251 B.R. 714,

717 (B.A.P. 8th Cir. 2000), <u>aff'd</u>, 2 Fed.Appx. 681 (8th Cir. 2001).

IDR argues that both grounds for nondischargeability under §

523(a)(1)(C) apply to Fliss's tax liability.  It contends that she

filed fraudulent returns for each of the three tax years at issue

and that she willfully attempted to evade or defeat the tax.  The

two parts of § 523(a)(1)(C) are independent provisions requiring

different elements, although there may be some overlap between the

two when a taxpayer has filed a return.  <u>Schlesinger v. United

States (In re Schlesinger)</u>, 290 B.R. 529, 537 n.5 (Bankr. E.D. Pa.

2002).


<u>Fraudulent Return</u>

The determination of whether a debtor has filed a fraudulent

return involves the same analysis used in imposing a civil fraud

penalty under § 6663 of the Internal Revenue Code.  <u>Id.</u>, 290 at 536;

<u>Kirk v. United States (In re Kirk)</u>, 98 B.R. 51, 55 (Bankr. M.D. Fla.

1989).  The elements of a fraudulent return are: (1) knowledge of

the falsehood of the return; (2) an intent to evade taxes; and (3)

an underpayment of the taxes.  <u>In re Schlesinger</u>, 290 B.R. at 536;

<u>In re Kirk</u>, 98 B.R. at 55.

Because it is unlikely that the taxing authority will have

direct evidence of intent to evade taxes, the court may infer such

intent from the debtor's entire course of conduct.  There are

several factors or "badges of fraud" that a court may consider as

evidence of intent to evade taxes.  In _Recklitis v. Comm'r_, 91 T.C.

874 (1988), the court provided a nonexclusive list of such factors:

> (1)  understating income;
> (2)  maintaining inadequate records;
> (3)  failing to file tax returns;
> (4)  giving implausible or inconsistent explanations of
>      behavior;
> (5)  concealing assets;
> (6)  failing to cooperate with tax authorities;
> (7)  engaging in illegal activities;
> (8)  attempting to conceal illegal activities;
> (9)  dealing in cash; and
> (10) failing to make estimated tax payments.

_Id._ at 910.  Other courts have listed similar factors that may tend

to create an inference of fraud, including underreporting large

amounts of income over a period of time, making transfers to family

members, making transfers for inadequate consideration, and making

transfers that reduce the taxpayer's assets subject to execution.

See _Dangler v. State of Iowa (In re Dangler)_, Adv. No. 94-5139XS,

slip op. at 7 (Bankr. N.D. Iowa Oct. 2, 1995) (citing cases).

Failure to report substantial amounts of income from

embezzlement is sufficient to raise an inference of fraudulent

intent.  See _Rogers v. Comm'r_, 111 F.2d 987, 989 (6th Cir. 1940)

(upholding fraud penalty against taxpayer convicted of embezzlement

whose income for three consecutive years was more than twice

reported); _Edwards v. United States (In re Edwards)_, 1995 WL 908384

at *6 (Bankr. E.D. Mo. 1995) (false returns omitting income from

embezzled funds was part of fraud scheme).

Fliss does not dispute that she underpaid taxes for the tax

years at issue.  IDR has also established the element of knowledge

of the falsity of the returns.  Fliss knew her initial tax returns

were false, because she knew she had income from embezzlement that

was not being reported to the IDR.  There was no evidence to support

the suggestion that Fliss thought of the embezzled funds as loan

proceeds.  Her failure to keep records of the amount taken belies

this contention.  Moreover, she spent all the money on family living

expenses and was soon embezzling money at a rate greater than her

wage earnings.  The court finds that Fliss thought of the embezzled

funds as income, albeit from an illegal source.

   Fliss claims that she did not know that embezzled income is

reportable for income tax purposes.  Fliss was described at trial as

an above-average employee who was intelligent, capable and very

knowledgeable.  She has had a year of college education and some

training in accounting.  She knew of the general duty to report

income to taxing authorities.  It is likely that she failed to

report the embezzlement income in order to keep the income a secret.

See In re Dangler, slip op. at 9-10 (rejecting debtor's similar

argument as unreasonable); see also Bieber v. United States (In re

Bieber), 151 B.R. 290, 294 (Bankr. S.D. Ga. 1992) (taxpayer who

knows of embezzlement income but not that it is taxable not entitled

to innocent spouse immunity for "mere ignorance of legal tax

consequences of transactions").  Fliss intentionally omitted the

income from her initial Iowa tax returns for 1999 through 2001.  The

returns were knowingly false.

Several factors indicate the intent to evade taxes necessary to a determination that Fliss filed fraudulent returns. Fliss acquired income from criminal activity that took place over a period of about three years. She embezzled more than $140,000 from her employer. During this same time, her income from wages was approximately $16,000 per year. Fliss concealed this activity from the Bank and, apparently, from her husband. She pleaded guilty to a Class "C" felony. Although she knew she had additional income, she failed to report the income on her tax returns. This omission furthered the concealment of the embezzlement. Fliss embezzled cash and kept nearly all the funds in the form of cash. She did not keep records of the amount she embezzled or of the manner in which it was spent. She was able only to estimate the total amount of money that she embezzled. Her only explanation of the use of the money was that she spent it for family living expenses. The family went out to eat "all the time," and Fliss gave money to her children "a lot." The court concludes that Fliss's tax liability for tax years 1999, 2000 and 2001 is a debt for tax with respect to which she made a fraudulent return for purposes of 11 U.S.C. § 523(a)(1)(C).

Fliss argues that, even if the court finds her initial tax returns were false, the tax liability at issue should be dischargeable, because she filed amended returns before the IDR knew she had income that had not been reported. Unlike the debtor in In re Dangler, Fliss did not file amended returns in response to a tax assessment. In Badaracco v. Comm'r, 464 U.S. 386, 104 S.Ct. 756

12

(1984), the Court determined that an amended return did not nullify the effect of filing an earlier fraudulent return.  In <u>Badaracco</u>, the court interpreted § 6501 of the Internal Revenue Code, the limitation statute for the assessment and collection of income tax. While the general limitations period is three years, if a taxpayer has filed a false or fraudulent return, the tax may be assessed "at any time."  26 U.S.C. § 6501(c)(1).  The Court found nothing in the statute that would permit a taxpayer's subsequent conduct to affect the limitations period.  "[A] taxpayer who submits a fraudulent return does not purge the fraud by subsequent voluntary disclosure; the fraud was committed, and the offense completed, when the original return was prepared and filed."  <u>Id.</u>, 464 U.S. at 394, 104 S.Ct. 762.  This court believes the analysis in <u>Badaracco</u> should apply to the term "fraudulent return" in § 523(a)(1)(C) of the Bankruptcy Code.  Fliss's subsequent conduct did not rid the original returns of fraud.  <u>See</u> <u>Meyers v. United States (IRS) (In re Meyers)</u>, 196 F.3d 622, 625 (6th Cir. 1999) (debtor's "subsequent repentant conduct" did not negate prior intent to evade tax).

## Willful Evasion

IDR claims also that Fliss's tax liability is nondischargeable under the second part of § 523(a)(1)(C), because she has willfully attempted to evade or defeat the tax.  This ground for nondischargeability contains both a conduct element, that the debtor sought "in any manner to evade or defeat" the tax, and an intent

element, that the debtor did so "willfully." <u>Matter of Birkenstock</u>,

87 F.3d 947, 951 (7th Cir. 1996); <u>In re May</u>, 251 B.R. at 718.

Nonpayment of the tax is not enough, in itself, to find the debt

nondischargeable. <u>Birkenstock</u>, 87 F.3d at 951.  In order to prove a

willful attempt to evade or defeat a tax, the taxing authority must

show that the debtor was aware of the duty to pay her taxes, had the

wherewithal to pay the taxes and took steps to avoid paying them.

<u>In re May</u>, 251 B.R. at 718.  The Bankruptcy Appellate Panel for the

Eighth Circuit, in <u>In re May</u>, listed several factors which indicate

a willful attempt to evade or defeat a tax obligation.  These

include "understatements of income, failure to file tax returns,

implausible or inconsistent behavior by the taxpayer, the failure to

cooperate with the tax authorities, concealment of assets, dealing

in cash, shielding income and otherwise frustrating collection

efforts."  251 B.R. at 718.  "Conduct aimed at concealing income and

assets constitutes a willful attempt to evade or defeat taxes."  <u>Id.</u>

(citing <u>Bruner v. United States (In re Bruner)</u>, 55 F.3d 195 (5th

Cir. 1995)).

  As discussed above, Fliss knew she had income from embezzlement

and was aware of her duty to report income to the taxing

authorities.  She understated her income on her Iowa tax returns for

tax years 1999, 2000 and 2001.  The additional income gave her the

wherewithal to pay the tax.  Her financial condition at the time of

filing her bankruptcy petition is not a defense to IDR's claim.  <u>In

re May</u>, 251 B.R. at 718 n.5.  Fliss embezzled cash and dealt almost

entirely in cash in spending the funds.  This scheme was designed to
conceal large amounts of income over a period of approximately three
years.  The court concludes that IDR has shown that Fliss's conduct
constituted a willful attempt to evade or defeat the tax.

After meeting with her bankruptcy attorney, Fliss reported the
embezzlement income to IDR.  Subsequently, she made monthly payments
on the tax for about a year.  Nonetheless, a taxpayer's later
repentant conduct "does not nullify earlier willful attempts to
evade or defeat taxes."  In re May, 251 B.R. at 718 (citing Meyers
v. United States (IRS) (In re Meyers), 196 F.3d 622 (6th Cir.
1999)).

IT IS ORDERED that Susan Marie Fliss's tax liability to the
Iowa Department of Revenue for tax years 1999, 2000 and 2001 is
excepted from her discharge pursuant to 11 U.S.C. § 523(a)(1)(C).
Judgment shall enter accordingly.

DATED AND ENTERED  March 8, 2006

William L. Edmonds, Bankruptcy Judge

15